[No. 8864. Department Two. September 23, 1910.]

THE STATE OF WASHINGTON, *on the Relation of Great Northern Railway Company, Plaintiff and Appellant*, v. RAILROAD COMMISSION OF WASHINGTON *et al., Defendants and Appellants.*[1]

RAILROADS—COMMISSION—ORDERS—RIGHT TO APPEAL—STATUTES. The provision in the railway commission law (Rem. & Bal. Code, § 8629), giving to railroad companies the right of appeal from orders of the superior court on reviewing orders of the railroad commission, was not intended to restrict the right of appeal to railroad companies, in view of Const., art. 4, § 4, giving the supreme court appellate jurisdiction in all civil cases, and Rem. & Bal. Code, § 1716, providing that any party aggrieved may appeal from the final judgment in any action or proceeding.

SAME—PARTY AGGRIEVED. The railroad commission has such an interest in defending its orders concerning railroad service and facilities, made in proceedings instituted by it, as to entitle it to appeal to the supreme court from orders of the superior court re-

[1]Reported in 110 Pac. 1075.

versing the orders of the commission, under Rem. & Bal. Code, § 1716, giving the right of appeal to any party aggrieved by the final order in any action or proceeding.

SAME—ORDERS—RAILWAY SERVICE—REASONABLENESS—REVIEW. Orders of the railroad commission respecting railroad service and facilities will not be set aside on appeal as unreasonable, unless they clearly so appear, the presumptions being that they are reasonable.

SAME—ORDERS—EXTENSION OF SPUR TRACKS. An order of the railroad commission requiring the extension of a spur track so as to permit teams to load and unload cars at all points of the extension, is not unreasonable, where it appears that there is such a necessity for team facilities to avoid inconvenience and delay; and it is not unreasonable in that it directs the particular manner in which the service shall be furnished, where the railroad company failed to show that the service could be furnished in some other manner less burdensome to it.

SAME—TRAIN SERVICE. An order of the railroad commission requiring an additional train from Anacortes to Burlington and return, to connect with the noon trains on the main line, is not unreasonable, in the absence of proof that its operation would result in a loss, where it appears that Anacortes is a city of five or six thousand inhabitants at the western terminus of a branch line, sixteen miles from the main line, doing a freight business of $20,000 per month, and $800 for passenger fares, the present service furnishing only a morning mail service and no close connection with the noon trains in both directions on the main coast line.

SAME—STATION FACILITIES—RECORD—REVIEW. An order of the railroad commission requiring a railroad to furnish modern flush toilets at a depot waiting room in a town of 2,000 inhabitants is unreasonable, where there was no proof as to the inadequacy of existing facilities; and the same cannot be sustained on the theory that the commission found it necessary on "a view of the premises," since the law contemplates that all the evidence be preserved in the record for the purposes of review.

SAME—LOCATION OF DEPOT. An order of the railroad commission requiring a railroad depot to be moved five hundred feet, in a town of seventy-five people, is unreasonable, where the only reason therefor was to bring the depot to the point on the railroad nearest the business center of the town.

SAME—TRAIN SERVICE. An order of the railroad commission requiring a railroad to stop one of its passenger trains on flag at a town of seventy-five people, one and one-half miles from another town of the same size, where its trains stop, is not unreasonable, where there is a siding at such place, doing a freight business of $2,738 in a year, a sawmill and a paint mill.

SAME. Orders of the railroad commission requiring a railroad to stop trains on flag at towns of 250 inhabitants, which were business centers of considerable importance, are not unreasonable, where such service would enable residents to visit their county seat and transact business and return the same day.

SAME—STATION FACILITIES. Orders of the railroad commission requiring a railroad to furnish running water for drinking purposes at its stations in small towns is unreasonable, in the absence of any evidence showing delinquency on the part of the company in the present service.

Cross-appeals from a judgment of the superior court for King county, Gay, J., entered November 20, 1909, on certiorari to review certain orders of the railroad commission, requiring the furnishing of railroad service and facilities, after a hearing before the court. Affirmed in part and reversed in part.

*F. V. Brown* and *Frederic G. Dorety*, for plaintiff.

*The Attorney General* and *W. V. Tanner, Assistant,* for defendants.

PARKER, J.—The railroad commission instituted an inquiry upon its own motion against the Great Northern Railway Company, touching the adequacy of service rendered and facilities furnished at different stations and places upon its line of railway. Hearings were had and evidence adduced relative to the matters involved, and at the conclusion thereof the commission made orders requiring the railway company to furnish certain services and facilities. The railway company, deeming itself aggrieved by certain of these orders, and desiring to have them reviewed and their reasonableness and lawfulness inquired into and determined, instituted proceedings in the superior court for King county for that purpose, as provided by § 8629, Rem. & Bal. Code. Thereupon that court, by writ of review, caused to be certified to it the orders and proceedings had before the commission relative thereto, including the evidence upon which such orders were based. Thereafter, upon a hearing in the superior court, it

rendered judgment reversing certain of the orders and affirming others made by the commission. Thereupon the commission appealed to this court from the judgment of the superior court reversing certain of its orders, and the railway company appealed to this court from the judgment of the superior court affirming other orders made by the commission. We will not attempt to state the issues involved except as they will appear in our discussion of the particular orders in question, which we will deal with separately, after noticing some matters we deem best to dispose of preliminary thereto.

We are first confronted with a motion of the railway company to dismiss the appeal of the commission, upon the ground that the commission has no right of appeal. The contentions of learned counsel for the railway company upon this motion may be reduced to two propositions: (1) That the law does not give any right of appeal from the superior court save to the corporation whose duty to the public is being inquired into; (2) that, in any event, the commission is not a party in the sense that it can be aggrieved by the decision of the superior court. The provisions of the railway commission law relating to appeals from the superior court are found in § 8629, Rem. & Bal. Code, as follows:

"Said railroad, express, telephone or telegraph company shall have the right of appeal or to prosecute by other appropriate proceedings, from the judgment of the superior court to the supreme court of the state of Washington, as in other civil cases. In all such proceedings, however, bonds shall be required conditioned as hereinbefore provided in addition to the usual appeal bond."

The additional bond here mentioned is the bond required by a preceding provision of this section as a condition precedent to the suspension of the orders of the commission pending a review thereof in the courts. Now, if the railway commission law was silent as to the matter of appeal from the superior court to the supreme court, it could hardly be seriously contended that the general law relating to appeals

was not ample to afford any aggrieved party the right of appeal from a judgment rendered by a superior court upon a review of orders of the commission. By that law it is provided, in § 1716, Rem. & Bal. Code:

"Any party aggrieved may appeal to the supreme court in the mode prescribed in this title from any and every of the following determinations, and no others, made by the superior court, or a judge thereof, in any action or proceeding.

"(1) From the final judgment entered in any action or proceeding, . . . ."

In art. 4, § 4, of our constitution, it is provided:

"The supreme court shall have . . . appellate jurisdiction in all actions and proceedings, excepting that its appellate jurisdiction shall not extend to civil actions at law for the recovery of money or personal property when the original amount in controversy or the value of the property does not exceed the sum of two hundred dollars. . . ."

We do not quote this constitutional provision with a view to arguing that the state may not withhold the right of appeal from one of its officers or commissions when made a party to an action or proceeding involving a matter of public concern only, but only as indicating the general liberal policy of our laws in allowing appeals to our court of last resort. In view of these statutory and constitutional provisions, we are not inclined to deny the right of appeal to the commission, in the absence of some special statute clearly evidencing the legislative intent to that effect. The only evidence we have of such an intent by the legislature is the provisions of § 8629 above quoted, which in terms seems to give the right of appeal to the railway company, with no provision therein as to an appeal by the commission or other party that may have instituted the proceedings in the first instance. If we need to look for a reason for the mentioning of the appeal by the railway company to avoid the conclusion that it was not intended to accord this right to the commission or other original complainant, it may be found in the special provision relat-

ing to giving bond other than the usual appeal bond in connection with the appeal by the railway company.

It may be well argued, as suggested by learned counsel for the commission, that the matter of appeal by the railway company was only mentioned in this statute for the purpose of prescribing the conditions upon which it might prosecute such appeal. It was certainly unnecessary to there give the right which was already so clearly given by the general appeal law. In any event, we are of the opinion that the mere absence of any express provision in the railway commission law giving the right of appeal to the commission, notwithstanding other provisions therein, does not give rise to an inference of sufficient strength to take from the commission the right of appeal so plainly given by the general law on that subject; providing, of course, the commission has such an interest in the matter as to be an aggrieved party.

It is argued by learned counsel for the railway company that the commission is not concerned officially or otherwise with the questions here involved; that while the law has conferred upon it the right to institute the inquiry by complaint before itself, and conduct the proceeding and make orders thereon, it can go no further, because the legislature has not in terms authorized it to do so. This argument, carried to its logical conclusion, would mean that, in a case where the inquiry was instituted at the instance of the commission, and its orders thereon were brought before the superior court for review, as they were in this case, the superior court would review such orders *ex parte*, hearing no one save the railway company. This is not analogous to a case appealed from a purely judicial tribunal where the tribunal appealed from has determined questions of private right between litigants. Of course, such a tribunal has no legal interest in maintaining its judgment. This commission is not such a tribunal. True, it acts in a sense judicially when it renders its decisions and makes its orders upon a hearing, but it acts in an altogether different capacity when it makes the preliminary complaint

and seeks to have its decisions and orders enforced. It seems to us the very fact that it is authorized to institute, upon its own motion, such an inquiry, must mean that it is authorized to do so in the interest of the public, just as a prosecuting attorney is authorized to file an information charging a crime. It is the public that is in effect the plaintiff in such a case, though in form the case is conducted in the name of the commission as plaintiff. If the commission has authority of this nature in the very inception of the matter when nothing is established against the company whose service is being inquired into, surely the right of the commission to defend its decisions and orders, which are presumed to establish the rights of the public, must exist when such decisions and orders are sought to be reviewed in the superior court. It would be strange, indeed, that the first right and duty should exist without the second. The public, which the commission represents and is acting for, is certainly as much interested in maintaining the validity of a decision or order made in its interest as it is in the institution of the inquiry which brings about such decision or order. In the first instance there is no presumption as to what the rights of the public are; while in the second, we have a decision presumably correctly establishing such rights. There are really stronger reasons calling for a defense of the final decision of the commission when assailed in court than there is for instituting the original inquiry. Of course, there was no occasion to provide for a review of the commission's orders at its own instance in the superior court in a case instituted originally upon its own motion.

These observations lead us to conclude that the commission has the right to defend its orders when assailed in the superior court, and it is but taking another step, and that a logical one, to hold that the commission may defend its orders in the interest of the public when they are assailed in the supreme court by an appeal from a decision of the superior court affirming such orders. Why, then, may not the commission

defend its orders by itself appealing from a decision of the
superior court when that court has reversed such orders? It
seems to us the right of the commission to defend its orders
must include the right to use all lawful means to that end, and
surely an appeal from the superior court is one of such law-
ful means. A situation very similar to this was dealt with in
*Ouachita County v. Rolland,* 60 Ark. 516, 31 S. W. 144,
where an order of the county court relating to the granting
of a license was reversed by the circuit court, and the judge
of the county court appealed from such reversal to the su-
preme court of the state, claiming the right to do so under
a statute which made it his duty to defend such a case in the
courts. Here we have no statute specifically making it the
duty of the commission to defend its orders and decisions in
the courts, but we think its right to do so is equally as clear
as if there was a statute to that effect. In that case the court
said:

"Section 1270, Sand. & H. Dig., provides: 'When appeals
are prosecuted in the circuit or supreme court, the judge of
the county court shall defend the same.' No other authority,
in this respect, it seems, has been given. The extent of that
given is not well defined, as it is not clear what is meant by
the words 'shall defend the same.' It is obvious that the au-
thority conferred by them was given for the purpose of pro-
tecting the interest of the county, which may be involved.
It would be against the liberal policy of the law to so limit it
as to deny him the right to take an appeal when the county
may be aggrieved by the judgment of a circuit court. As a
general rule, all parties aggrieved are allowed to take ap-
peals from all judgments of the circuit and inferior courts.
There can be no good reason why counties should be denied
the same right, except as to judgments of the county courts.
As to these judgments, it would serve no useful purpose to
give the county judge the right to appeal; as it is presumed
that, having rendered the judgments, he would never see the
occasion for exercising it. But it is different as to judg-
ments of the circuit courts which affect the interest of a
county. The statute recognizes this difference when it says:
'When appeals are prosecuted in the circuit or supreme court,

the judge of the county court shall defend the same.' But how is he to 'defend the same'? Necessarily by taking such action as will secure or protect the interest of his county as he shall see it. By imposing this duty upon him the statute incidentally and necessarily invested him with the right to use those remedies provided for that purpose. Among these one of the most valuable is the right to appeal to the highest court."

See, also, *Ex parte Morton*, 69 Ark. 48, 60 S. W. 307; *State ex rel. Schintgen v. La Crosse*, 101 Wis. 208, 77 N. W. 167; *Moede v. County of Stearns*, 43 Minn. 312, 45 N. W. 435. We are of the opinion that the commission, acting for the public, has such an interest in the matter as entitles it to appeal.

The validity of the orders of the commission here involved depends upon their reasonableness. So the question for us to determine is, Are those orders unreasonable requirements of the railway company, in view of its property rights and its duty to the public? In the examination of these questions we are to remember that neither the superior court nor this court is the original tribunal for determining, in the first instance, what services or facilities may be reasonably required of the railway company. The commission is to determine that, in view of the facts brought before it in each particular case. The courts are only to determine whether or not the commission has, in the particular case, exceeded the bounds of reasonableness in its orders requiring services and facilities, and in determining that question the courts are to indulge in the presumption that the commission has acted within the bounds of reasonableness, and hence has acted lawfully. It must clearly appear to the contrary before its orders can be set aside. Rem. & Bal. Code, § 8634. *Northern Pac. R. Co. v. Railroad Commission*, 57 Wash. 134, 106 Pac. 611; *Minneapolis etc. R. Co. v. Railroad Commission*, 136 Wis. 146, 116 N. W. 905; *Morgan's etc. R. Co. v. Railroad Commission*, 109 La. 247, 33 South. 214; *Atchinson T. & S. F. R. Co. v. State*, 23 Okl. 210, 100 Pac. 11; *Interstate*

*Commerce Commission v. Illinois Cent. R. Co.*, 215 U. S. 452.
We will now proceed to examine the question of the reason-
ableness of each particular order involved in the appeals.

One of the orders of the commission was to the effect that
the present spur track at the station of Custer be extended
at least two hundred feet, and that the approaches thereto
be cleared so as to permit teams to load and unload at all
points along such extension. This order was reversed by the
superior court, and is involved in the commission's appeal.
It appears from the evidence that there is often a necessity
at this station of having facilities for unloading cars to and
from teams direct, to the extent of eight or more cars at the
same time. At present the railway company has a spur
track at this station so situated that it affords opportunity
for the unloading or loading of one car only to or from teams
at the same time. On the opposite side of the main track from
this spur, there is a passing track so situated that it affords
opportunity for the unloading or loading of only five cars to
or from teams at the same time, and cars are often placed
upon this passing track for that purpose as well as upon the
spur. There are times when there is a necessity for team
facilities to the extent of twelve cars. Considerable delay
and inconvenience are experienced in the loading and unload-
ing of cars upon the passing track, on account of the switch-
ing which necessarily has to be done there.

The principal contention of learned counsel for the rail-
way company is, in substance, that the railway company
should be permitted to choose the manner of furnishing such
facilities, and that the order of the commission should go
no further than to direct it to furnish the same, without di-
recting the manner of so doing. It seems to us, however,
that the logical result of this argument would be, in the ma-
jority of cases, to leave the order of the commission so vague
and uncertain as to render its enforcement impracticable.
This order is not unreasonable simply because the increased
facilities are directed to be furnished in a particular manner.

It was, no doubt, the privilege of the railway company to show to the commission upon the hearing that there was some other manner of furnishing the increased facilities, equally good for the public and less burdensome for the railway company.

We can easily imagine a case where the making of an order by the commission directing the furnishing of a service in a particular manner, when another manner of so doing would be of equal value to the public and less burdensome to the railway company, would be so unreasonable as to call for reversal by the courts. It is argued that the order is unreasonable in this particular, since it appears that the passing track can be rendered available for more teams loading and unloading by filling for a distance alongside thereof, thus creating a longer driveway. We are not advised by the evidence that one of these methods would be less burdensome to the railway company than the other in the way of expense. There is clearly room for contention that the public would be better served by an extension of the spur where the shipper will probably be less inconvenienced by switching of passing trains, than by the extension of a roadway upon the passing track. The facts here shown do not, in our opinion, so clearly establish the unreasonableness of this order as to warrant interference therewith by the court. The increased facilities seem necessary to public convenience, and it does not appear that the manner in which they are directed to be furnished by the order is unreasonably burdensome upon the railway company. We conclude that the judgment of the superior court reversing this order of the commission should be reversed. It is so ordered.

Another order of the commission was to the effect that the railway company cause an additional passenger train to be run from Anacortes in the forenoon so as to connect with the north and south-bound trains at Burlington at approximately the noon hour, and returning leave Burlington for Anacortes within thirty minutes after the arrival of those trains. This

order was reversed by the superior court, and is involved in the commission's appeal. This order was made with a view to a better train service for the people of Anacortes, and was the result of the facts developed at the hearing, in substance as follows: Anacortes is a town of five or six thousand inhabitants, situated in Skagit county, at the western terminus of the Rockport branch of the railway company's lines, about sixteen miles west of Burlington, where that branch crosses the main north and south coast line of the railway company. This main line connects the cities of Seattle, Everett, Bellingham, and Vancouver, B. C. Mount Vernon, the county seat of Skagit county, is also on this main line, about four miles south of Burlington. The total amount of business done by the railway company at Anacortes is about $20,000 per month for freight, and about $800 per month for passenger fares, the latter representing about the same number of passengers. This is the only rail communication between Anacortes and Mount Vernon.

The evidence indicates that the travel by rail between Anacortes and the county seat would probably be considerably increased if the extra train service was furnished as ordered, a considerable part of that travel being at the present time by road vehicles on account of the inconvenient train service. At the time of the hearing, the first train left Anacortes at 7 : 15 a. m., returning at 9 : 50 a. m. Another train left Anacortes at 5 : 45 p. m., returning at 8 p. m. A freight train, bringing mail, and also passengers if they cared to ride thereon, arrives at Anacortes from Burlington generally about 5 p. m., though it is scheduled to arrive earlier. Through trains on the cost line arrive from both directions at Burlington at about the noon hour, with which there is no close connection for Anacortes. The present train service has the effect of furnishing only a morning mail service to Anacortes so far as the arrival of mails is concerned, the afternoon and evening trains arriving too late for distribution until morning. Upon the showing of these facts, the commission an-

nounced that, unless a showing was made indicating that the running of a midday train from Anacortes to Burlington and return would result in loss to the railway company, such a service would be ordered to be furnished. No such showing was attempted prior to the making of the formal order. However, the railway company put on an additional train leaving Anacortes at 10:45 a. m., arriving at Burlington about an hour later, and upon its return from Rockport arrived at Burlington at 9 p. m. and at Anacortes at 10 p. m. This train, it will be noticed, helped the passenger service to some extent by arriving at Burlington a short time before the noon hour, but not in returning, and did not have any material effect on the mail service so far as the arrival of mails at Anacortes is concerned.

We think these facts show that the train service ordered by the commission would be a materially better service than that which the railway company is furnishing, even with the added train put on since the hearing, and we have seen that there is no showing that such train service as so ordered by the commission would be unreasonably burdensome upon the railway company by being operated at a loss. It may be that, in view of the train service now furnished to Anacortes, this additional service ordered by the commission is not such a service as could be reasonably required of the railway company upon a showing that its operation would result in a material loss to the railway company. But, in view of the facts shown, it seems to us that this order is not so clearly unreasonable that it calls for interference therewith by the courts. It follows that the judgment of the superior court reversing this order of the commission should be reversed. It is so ordered.

Other orders made by the commission were to the effect that the railway company be required to install modern flush toilets, accessible to depot waiting rooms, at certain stations. These orders were reversed by the superior court, and are involved in the commission's appeal. These orders are discussed by counsel as though the facts upon which they were

based are substantially the same at the several stations, taking the facts shown by the evidence relative to Colville as the basis for their arguments. We will deal with the question in the same manner.

Learned counsel for the commission do not point in their brief to any evidence in the record showing the present toilet facilities furnished by the railway company at Colville or any other of the stations. In view of the burden of the argument resting upon them to show error of the learned trial court in reversing these orders of the commission, we do not feel called upon to search this voluminous record for evidence showing the nature of such facilities, but will presume there is no such evidence. There is evidence tending to show that there is a water works system in the town rendering it practicable to install modern flush toilets, and so far as this record indicates, this seems to be the only fact which prompted the commission to make the order. It seems to us that such a showing alone is not sufficient to establish the necessity for such toilets at the station. There should be at least some evidence produced at the hearing tending to show that there was some neglect of duty on the part of the railway company in furnishing toilet facilities. The mere fact that modern flush toilets could be furnished does not establish such result. It is plainly the spirit of the railway commission law that the commission is to make orders of this nature only upon the production of evidence before it, showing a necessity for the facilities ordered. This, of course, can be shown either by proof of no existing facilities, or by proof of inadequate existing facilities. There was no proof of either in this case. It is possible that a particular appliance or facility may be so common for a given service that it could be said no other appliance or facility is suitable therefor, and in such a case, possibly, it could be lawfully ordered by the commission to be supplied by the railway company, by a mere showing that it was not being used in a service required to be furnished the public. But it cannot be assumed, without any proof of what

toilet facilities the railway company is furnishing, that modern flush toilets are the only proper facilities for service of this nature in a town of two thousand inhabitants, as this evidence shows Colville to be.

Our attention is called to the fact that the commission viewed the stations. If this is meant as a suggestion that we are to presume that its members thereby acquired information as to existing facilities, and possibly based their orders upon such information as well as upon the evidence produced before them, it should be replied to by pointing out that the law clearly contemplates that all the evidence upon which the commission bases an order of this nature is to be preserved in some permanent form, to the end that *all of it* be certified to the court upon a review. Upon no other theory could the court determine the reasonableness of the commission's orders. If an order can rest upon information obtained by a view of the members of the commission, without such information being in any manner brought before the court upon a review, then no order could be held to be either reasonable or unreasonable, legal or illegal by the court, except such an order as would so show by its own terms. In such a case the presumption of reasonableness would practically destroy the right of review in the courts, in view of the fact that no evidence can be received before the court, the question being determinable there only upon the evidence produced before the commission, and by it certified to the court. The hearing before the commission is viewed by the reviewing court very much as any other trial in a lower tribunal is reviewed by a reviewing court. There must be some evidence to support the determination of the tribunal hearing the matter, or its determination cannot stand when properly challenged in the reviewing court. Indeed, this *judicial nature of the hearing* before the commission, in view of the want of opportunity to produce evidence in the courts touching the reasonableness of the orders, is what really saves the law from being unconstitutional. *State ex rel.*

*Oregon R. & Nav. Co. v. Railroad Commission,* 52 Wash. 17, 100 Pac. 179; *Chicago M. & St. P. R. Co. v. Minnesota,* 134 U. S. 418. We assume that all of the evidence upon which the commission based its order is before us, as the law clearly contemplates that it shall be in order that the right of judicial review be fully secured. Notwithstanding the presumption as to the reasonableness of the orders, we are of the opinion that there is such a want of evidence in this record showing inadequate toilet facilities at the several stations named that the orders of the commission for the furnishing of modern flush toilets are unreasonable, and therefore unlawful. The judgment of the learned superior court reversing these orders of the commission is affirmed.

Another order of the commission was to the effect that the station building at Lamona be moved from its present location to a point about five hundred feet distant. This order was reversed by the superior court, and is involved in the commission's appeal The facts shown upon which this order was made are, in substance, as follows. Lamona is a town of about seventy-five people. The station building is now located within five or six hundred feet of the point upon the railway nearest the business center of the town. This is the point to which the station building was ordered removed. There does not appear to be any reason for moving the station building to this point other than to bring it that much nearer to the business center of the town. There does not appear to be anything in the lay of the ground rendering the station building other than easy and convenient of access at present. Its present location appears to have been prompted by what seems to be a rule of the railway company of keeping their station buildings, where practicable, one hundred and fifty feet or more away from other buildings on account of fire, and also because its present location enables an engine to take water from the tank while the train is at the station, though that could probably be done at the proposed new location, since it is about an equal distance from the tank

on the opposite side. These facts, it seems to us, show that the order was unreasonable. We agree with the views of one of the commissioners who dissented from this order, saying: "I dissent on the ground that I think that, when a station is located in a town on level ground, that a distance of five hundred feet from its most central point is not sufficient grounds to order a removal from that point." We are of the opinion that the judgment of the superior court reversing this order should be affirmed. It is so ordered.

Another order of the commission was to the effect that the railway company cause one passenger train in each direction to stop at Kulzer' Spur on flag, and that the same be shown upon the next published schedule, leaving the railway company to elect as to which of its trains would so stop. This order was reversed by the superior court, and is involved in the commission's appeal. It appears from the evidence, in substance, as follows: Kulzer's Spur is a little over one and one-half miles south of the station of Valley, where the trains stop. Kulzer's Spur is a town or community of seventy-five people, being nearly as large as Valley, where its residents are now required to take the trains. The railway company has a siding there, but nothing more. There is a sawmill, and also a paint mill there. In 1898 the railway company received $2,738 from freight shipped and received at this siding. It might seem that this is a very short distance from the regular stopping place at Valley to require the railway company to stop its trains for passengers, but in view of the population centered there and the very slight service required of the railway company, we do not think this order can be said to be so clearly unreasonable as to warrant an interference therewith by the courts. The learned counsel for the railway company call our attention to the case of *State ex rel. Railroad & Warehouse Comr's v. Minneapolis & St. Louis R. Co.*, 76 Minn. 469, 79 N. W. 510, in support of their contentions. In that case it appears that an order of the commission required much more service than

does this order, and besides, the point where the station was directed by that order to be established was only seven-tenths of a mile from an established station on the same line. It is also to be remarked that that decision was rendered by a divided court. We conclude that the learned superior court was in error in reversing this order of the commission. Therefore its judgment to that effect is reversed.

Other orders of the commission were to the effect that the north-bound forenoon train and the south-bound afternoon train should stop at Blue Creek on flag, and that the north-bound forenoon train should stop at Arden on flag. The order as to Blue Creek was reversed by the superior court, and is involved in the commission's appeal; while the order as to Arden was affirmed by the superior court, and is involved in the railway company's appeal. We will notice these orders together, since we think they rest upon facts so near alike as to call for the same disposition. These towns are business centers of some considerable importance, each having approximately two hundred or more inhabitants. They are situated in Stevens county south of Colville, which is the county seat of that county, and on the same line of railway. The stopping of these trains as ordered would enable the residents of these towns to visit their county seat, transact business therein, and return the same day, which otherwise they cannot do with the present train service.

There is no doubt of the desirability of this proposed service, so far as public convenience is concerned, at those points. These trains are through trains, making connections with other lines at Spokane on the south, and also at other points on the north. The only reason seriously urged against the stopping of these trains as ordered is that it would tend to lengthen the running time of the trains, and that other small towns might demand similar service and thus result in preventing the making of the connections as at present, thus inconveniencing the public more than this proposed service would benefit the public. It does not seem to us, however,

that the evidence shows that these stops would result in break-
ing present connections, and we think we are now only called
upon to consider the possible conflict between these proposed
stops and the other service which might be directly affected
thereby. When other stops of this nature directly affect
other service, it will be time enough to consider their effect
thereon. We cannot say that these orders of the commission
are so plainly unreasonable as to cause them to be subject to
reversal by the courts. We therefore conclude that the judg-
ment of the superior court reversing the order of the commis-
sion as to Blue Creek should be reversed, and that the judg-
ment of the superior court affirming the order of the com-
mission as to Arden should be affirmed.

Other orders of the commission require of the railway com-
pany "that running water be installed in each of the wait-
ing rooms" at the stations of Ferndale, Sedro-Woolley, Stan-
wood, Leavenworth, Wilson Creek, Orient, Colville, and New-
port. These orders were affirmed by the superior court, and
are involved in the railway company's appeal. These orders
are all dealt with by counsel for both sides as though they
were based upon substantially the same state of facts, taking
the facts relative to Colville as the basis of their argument.
So we feel warranted in doing the same. This running water,
we assume from counsel's argument, is ordered to be in-
stalled for the purpose of drinking, though the orders are
silent upon that question. All of the information we have as
to the kind of drinking water facilities which are at present
furnished by the railway company at Colville is contained in
the following evidence:

"Q. What kind of drinking water is supplied in the wait-
ing room now? A. I could not say. I never drank any of it.
Q. How is it provided? A. I believe it is in a tank, a little
reservoir. Q. Not running water in the station. A. No,
sir."

It seems to us the views we have expressed relative to the
order for modern flush toilets disposes of this running water

problem.   The various methods of furnishing drinking water facilities in public places are sufficiently well known to enable us to take notice that running water is not the only sanitary method, or necessarily the best method, of furnishing drinking water in such places.   For aught this record shows, the railway company may be furnishing distilled water; or it may be furnishing ice water, with ample periodical changes to keep it pure and sanitary.   For aught this record shows, the railway company may be furnishing much better water than the running water would be if furnished in compliance with this order.   We are not assuming that the railway company is doing so.   We are only pointing out that there was no proof to the contrary.   As we have attempted to show in discussing the orders for toilets, there must be some proof of some delinquency in a service on the part of the railway company which the public is entitled to have before any order can be lawfully made by the commission for the furnishing or bettering of that service.   We are of the opinion that these orders were unreasonable for want of proof to support them, as above indicated.   The judgment of the superior court affirming these orders of the commission is therefore reversed, and the orders of the commission are also reversed and annulled.

There was originally involved in this appeal other orders, but they do not appear to be any longer in controversy.   We therefore deem it unnecessary to notice them.

In view of this disposition of the appeals, each party will pay its own costs in this court.

RUDKIN, C. J., MOUNT, CROW, and DUNBAR, JJ., concur.